IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

SHERYL WALTON, et al.,                    )
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )        Case No. 05-04001-CV-C-SWH
                                          )
EDGE MEDICAL PROFESSIONAL                 )
SERVICES, LLC, et al.,                    )
                                          )
                    Defendants.           )


ORDER

Plaintiffs brought this action pursuant to 42 U.S.C. § 2000e alleging that they were subjected

to sex discrimination and then suffered retaliation when they reported the conduct.  Plaintiffs

contend that they were employed by defendants as single or joint employers.  According to

plaintiffs, defendants are interrelated companies, providing complementary services out of

centralized common facilities.  Plaintiffs argue that management, labor relations and financial

control of each defendant is exercised in common with the other defendant.

Plaintiffs filed a Motion for Partial Summary Judgment requesting that the Court adjudge

that defendant Boyce & Bynum Pathology Laboratories, P.C., (hereafter "Boyce & Bynum") is a

single or joint employer with defendant Edge Medical Professional Services, LLC, (hereafter "Edge

LLC") for purposes of plaintiffs' causes of action in this lawsuit.  (Plaintiffs' Motion for Partial

Summary Judgment (doc #44) at 1)  Defendant Boyce & Bynum filed a Motion for Summary

Judgment[1] requesting that the Court grant it summary judgment on all counts in plaintiffs' Amended

_____

[1]Defendant Edge LLC was granted leave to join in this motion on April 14, 2006.

Complaint. (Motion for Summary Judgment (doc #45) at 1) Defendant Boyce & Bynum (and defendant Edge LLC through its joinder) argue that Boyce & Bynum is not a single or joint employer of plaintiffs and that this issue is dispositive of all plaintiffs' claims against defendant Boyce & Bynum. (Suggestions in Support of Motion for Summary Judgment (doc #46) at 1-2) This Order will address both motions for summary judgment.

## I. STANDARDS FOR EVALUATING A MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted when the pleadings and evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The nonmoving party may not rest upon allegations or general denials, but must come forward with specific facts to prove that a genuine issue for trial exists. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In doing so, all evidence and inferences therefrom are viewed in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

## II. UNDISPUTED MATERIAL FACTS

The following facts are deemed uncontroverted for purposes of Plaintiffs' Motion for Partial Summary Judgment and defendant Boyce & Bynum's Motion for Summary Judgment in which defendant Edge LLC joins:

### A. **The Entities and Individuals Involved**

#### 1. **Defendant Boyce & Bynum**

1.      Defendant Boyce & Bynum is a Missouri corporation in good standing. (Plaintiffs' Fact #1)

2.      Defendant Boyce & Bynum was formed in 1968. (Defendants' Fact #1)

2

3.       Boyce & Bynum does laboratory pathology work–testing and analyzing biological specimens, including blood samples.  (Defendants' Fact #2)

4.       The blood samples Boyce & Bynum tests are drawn by Boyce & Bynum employees, Boyce & Bynum's clients (clinics, nursing homes, etc.), or independent contractors hired by clients.  (Defendants' Fact #3)

5.       Michael Gray, Dr. Robert Cheek and Dr. Michael Curry are the three top persons on the organizational chart in the hierarchy of defendant Boyce & Bynum.  (Plaintiffs' Fact #87)

6.       The physical and mailing address for defendant Boyce & Bynum during the period from October 3, 2002 through December 31, 2003 was:  200 Portland Street, Columbia, Missouri 65201.  (Plaintiffs' Fact #2)

7.       Boyce & Bynum's main office is located at 200 Portland, Columbia, Missouri. (Defendants' Fact #4)

8.       Boyce & Bynum also has an office at 244 E. Primrose in Springfield, Missouri. (Defendants' Fact #5)

9.       Robert Cheek and Michael Curry were shareholders in defendant Boyce & Bynum during the period from October 3, 2002 through December 31, 2003.  (Plaintiffs' Fact #109)

10.      The number of Boyce & Bynum shareholders and directors has varied throughout the years, but from 2002 to present, there were 11 shareholders/directors (including Dr. Michael Curry and Dr. Robert Cheek).  (Defendants' Fact #6)

11.      Boyce & Bynum's day-to-day operations from 2002 to present were managed by Michael Gray.  (Defendants' Fact #7)

12.      During that time, Gray was employed by Boyce & Bynum Professional Services, Inc., an associated company that has a management contract with Boyce & Bynum. (Defendants' Fact #8)

13.      Lee Dillon has never had any management responsibilities or ownership interest in Boyce & Bynum.  (Defendants' Fact #26)

         **2.       Defendant Edge Medical Services, Inc.**

14.      Defendant Edge Medical Services, Inc. (hereafter "Edge Inc.") was incorporated in 1991.  (Defendants' Fact #9)

3

15.     Edge Inc. was a mobile medical services provider, sending its employees out to its clients' locations to perform x-ray services and phlebotomy (blood-drawing) services. (Defendants' Fact #10)

16.     At all times relevant to this lawsuit, Lee Dillon was the sole shareholder and director of Edge Inc. (Defendants' Fact #11)

17.     Dillon was responsible for the day-to-day management of Edge Inc., including setting employment policies and hiring, firing and discipline of employees. (Defendants' Fact #12)[2]

18.     All plaintiffs worked for Edge Inc. Conny Hogan worked in medical billing. Robin Kalb worked as a phlebotomist. Melissa Welch worked as a dispatcher for the phlebotomists and x-ray technicians. Sheryl Walton worked as a phlebotomist, and later as lab services supervisor. (Defendants' Fact #13)

19.     Plaintiffs allege that Dillon began sexually harassing them when they were employed at Edge Inc. (Defendants' Fact #14)

20.     Many of Boyce & Bynum's and Edge Inc.'s common customers were nursing homes, which needed both routine blood-drawing (Edge Inc.) and blood-testing services (Boyce & Bynum). (Defendants' Fact #16)

21.     In 2002, Edge Inc. began having financial problems. (Defendants' Fact #17)

22.     Dillon offered to sell part of Edge Inc. to Boyce & Bynum. (Defendants' Fact #18)

23.     The Boyce & Bynum Board of Directors rejected Dillon's offer. (Defendants' Fact #19)

24.     Three individuals, Dr. Robert Cheek, Dr. Michael Curry and Michael Gray, agreed to form a new company with Edge Inc. to continue Edge Inc.'s business. (Defendants' Fact #20)

        **3.      Defendant Edge LLC**

25.     Gray, Dr. Curry and Dr. Cheek formed Edge LLC for personal investment reasons. (Defendants' Fact #21)

---

[2]Plaintiffs state that they admit these allegations, but deny that Dillon had sole responsibility for the management functions listed. However, the references provided by plaintiffs do not support their challenge to defendants' fact.

4

26.    The new company was called Edge Medical Professional Services, LLC and was formed in September 2002.  (Defendants' Fact #22)

27.    Gray, Dr. Curry and Dr. Cheek did not form Edge LLC at Boyce & Bynum's request. (Defendants' Fact #23)

28.    Dillon described the creation of Edge LLC to employees as a "merger" between Edge Inc. and Boyce & Bynum.  (Defendants' Fact #24 (modified))[3]

29.    Defendant Edge LLC is a Missouri Limited Liability Company in good standing with the State of Missouri.  (Plaintiffs' Fact #3)

30.    Michael Gray, Dr. Robert Cheek and Dr. Michael Curry were members of Edge LLC along with the corporate entity Edge Inc.  Michael Gray and Dr. Curry were managers of Edge LLC.  (Plaintiffs' Fact #88)

31.    Dr. Michael Curry, Michael Gray and William Lee Dillon are the management of Edge LLC.  (Plaintiffs' Fact #89)

32.    Lee Dillon was responsible for the day-to-day management of Edge LLC.  Dillon, Gray and Dr. Curry shared "board" decision-making responsibilities.  (Defendants' Fact #27)

33.    Dr. Cheek was a "silent owner" of Edge LLC–he had a financial interest in the company but did not participate in the decision-making of the company. (Defendants' Fact #28)

34.    When Edge LLC took over Edge Inc.'s business, Edge LLC maintained Edge Inc's phlebotomy and x-ray businesses, employed Edge Inc.'s employees and provided services for Edge Inc.'s customers.  (Defendants' Fact #29)

35.    Edge LLC, just like Edge Inc., drew blood that was transported to Boyce & Bynum for testing.  (Defendants' Fact #30)

36.    Edge LLC operated out of Edge Inc's offices at 1922 Woodland, Springfield, Missouri and 201 West Broadway, Suite 1D, Columbia, Missouri.  (Defendants' Fact #31)

37.    According to defendant Boyce & Bynum, from approximately August 2003 through December 2003, defendant Edge LLC also used the mailing address of 200 Portland

_____

[3]Per plaintiffs' objection, this fact was modified to more accurately reflect what the citation provided by defendants supports.

5

Street, Columbia, Missouri 65201 as its business mailing address. (Plaintiffs' Fact #4)

38.     The Edge LLC letterhead had on it the address of 200 Portland, Columbia, Missouri. (Plaintiffs' Fact #73)

39.     The Operating Agreement of Edge LLC, section 6, identifies the principal office of Edge LLC as 200 Portland Street, Columbia, Missouri. (Plaintiffs' Fact #74)

40.     200 Portland Street, Columbia, Missouri is the principal office of Edge LLC and defendant Boyce & Bynum. (Plaintiffs' Fact #75)[4]

41.     For a period, Sheryl Walton served as Lab Services Supervisor for Edge Medical. (Plaintiffs' Fact #108)

42.     Karen White served as office manager for Edge LLC the entire time period that the entity was a limited liability corporation. (Plaintiffs' Fact #110)

43.     Melissa Welch remembers taking phone calls from Gerry Therien, Roger Asbury, Mike Curry and Michael Gray, while answering phones at the Edge LLC location in Springfield, Missouri. (Plaintiffs' Fact #100)

**4.      Dr. Michael Curry**

44.     Michael Curry is President of the Board of Directors of defendant Boyce & Bynum, and an officer. (Plaintiffs' Fact #80)

45.     As president of defendant Boyce & Bynum, Curry takes part in setting policies and business plans of defendant Boyce & Bynum. (Plaintiffs' Fact #81)

46.     Likewise, as a member of the board of managers of Edge LLC, Curry participated in setting business plans and goals for Edge LLC. (Plaintiffs' Fact #82)

47.     Curry participated in Boyce and Bynum's business as president "in the same way" that he participated in Edge LLC's business as a member of the board of managers of that entity. (Plaintiffs' Fact #83)

**5.      Michael Gray**

---

[4]Defendants state that they admit these allegations, but object to any characterization that the 200 Portland office in Columbia, Missouri was the principal office of Edge LLC for employment purposes.

48.     Michael Gray is assistant-secretary to the board of directors of defendant Boyce & Bynum.  (Plaintiffs' Fact #84)

49.     Michael Gray was the primary contact initially from Mr. Dillon regarding issues involving Edge LLC.  (Plaintiffs' Fact #86)

50.     Michael Gray was the registered agent for defendant Edge LLC for all dates between October 3, 2002 and December 31, 2003, using the address:  200 Portland Street, Columbia, Missouri 65201.  (Plaintiffs' Fact #5)

51.     Michael Gray provided answers to plaintiffs' interrogatories on behalf of Edge LLC as a "member and manager."  (Plaintiffs' Fact #106)

52.     Michael Gray provided answers to plaintiffs' interrogatories on behalf of Boyce & Bynum as a "Vice President."  (Plaintiffs' Fact #107)

**6.      Dr. Robert Cheek**

53.     Dr. Robert Cheek is Vice President of defendant Boyce & Bynum.  (Plaintiffs' Fact #85)

**7.      Gerry Therien**

54.     Gerry Therien was employed by defendant Boyce & Bynum and in his position did marketing, business development, human resources and outpatient service centers. (Plaintiffs' Fact #6; Defendants' Fact #50)

55.     Therien's marketing duties included making sales calls to nursing homes and other clients.  (Defendants' Fact #51)

56.     Therien's human resource functions included hiring and firing employees for Boyce & Bynum.  (Defendants' Fact #72 (modified))[5]

**8.      Roger Asbury**

57.     Roger Asbury is an employee of defendant Boyce & Bynum.  (Plaintiffs' Fact #17)

58.     Asbury received wages, benefits, W-2 and W-4 from defendant Boyce & Bynum. (Plaintiffs' Fact #18)

---

[5]Per plaintiffs' objection, this fact was modified to more accurately reflect what the citation provided by defendants supports.

7

59.     Asbury is a part of the management team of defendant Boyce & Bynum. (Plaintiffs'
        Fact #19)

60.     In Asbury's job at Boyce & Bynum, he works with the manager and shareholders of
        Boyce & Bynum to direct the financial management of the company. (Defendants'
        Fact #49)

**B.      Marketing and Servicing Clients**

61.     Boyce & Bynum solicited common clients with Edge Inc., and later, Edge LLC, to
        get nursing home business. (Defendants' Fact #52)

62.     Sales people from Boyce & Bynum and Edge LLC often went on sales calls together
        to solicit a common client for their respective businesses. (Defendants' Fact #33)

63.     Boyce & Bynum and Edge LLC soliciting common clients was advantageous to the
        clients, because the two companies combined offered a complete service (blood-
        drawing and testing), rather than the client having to seek out providers of each
        service separately. (Defendants' Fact #34)

64.     Certain nursing homes were clients of both Edge LLC and Boyce & Bynum.
        (Defendants' Fact #53)

65.     Edge Medical had no clients that were not also Boyce & Bynum clients. (Plaintiffs'
        Fact #98)

66.     Employees from Edge LLC and Boyce & Bynum went on sales calls to the nursing
        homes, and both Edge LLC and Boyce & Bynum entered into their own contracts
        with the client. (Defendants' Fact #54 (modified))[6]

67.     When Edge Inc. was in operation, Larry Coffman was the lab services supervisor.
        Coffman represented Edge Inc. on the sales calls with Therien. (Defendants' Fact
        #57)

68.     After Edge LLC began operations, Sheryl Walton became the lab services
        supervisor, and she went on sales calls with Therien. (Defendants' Fact #58)

69.     Boyce & Bynum utilized a contract with its clients which provided that Boyce &
        Bynum would perform lab work required by the contract, and that Edge LLC would

---

        [6]While plaintiffs deny this fact, the references provided by plaintiffs do not support their
challenge to defendants' fact. This fact, however, was modified to more accurately reflect what
the citation provided by defendants supports.

8

perform phlebotomy services required by the contract.  (Plaintiffs' Fact #7)[7]

70.     The contract was drafted by Gerry Therien.  (Plaintiffs' Fact #8)

71.     Clients became confused as to which entity to contact regarding services under this contract, resulting in phone calls requesting clarification, so Therien decided to clarify the contract itself to expressly provide what Boyce & Bynum would do and what Edge would do.  (Plaintiffs' Fact #9)

72.     The contract offered to clients of Boyce & Bynum set forth the duties of Boyce & Bynum and the duties of Edge Medical.  (Plaintiffs' Fact #10)[8]

73.     Clients of Boyce & Bynum signed the contracts.  (Plaintiffs' Fact #11)

74.     Therien, or one of Boyce & Bynum's marketing people, would obtain the signature of the client on the contract.  (Plaintiffs' Fact #12)

75.     The contract would be kept by defendant Boyce & Bynum in Mr. Therien's department–the personnel department.  (Plaintiffs' Fact #13)

76.     Edge is the only entity for which defendant Boyce & Bynum had a contract specifying services to be provided to Boyce & Bynum's customers by that entity.  (Plaintiffs' Fact #14)

77.     "The whole strategy of this was that we could walk into a home and offer both services, laboratory services and radiology services."  (Plaintiffs' Fact #15)

78.     In marketing defendants' services, Therien would inform the prospective client that "we have a company that draws the blood, they would be in this area, and I'll have them contact you."  (Plaintiffs' Fact #16)

79.     Sheryl Walton recalls having seen a nursing home contract that specified that Boyce & Bynum would do the laboratory testing on specimens and Edge Medical would provide the phlebotomy service.  (Plaintiffs' Fact #79)

---

[7]Defendants state that they admit these allegations, but object to any characterization that there was more than one such contract.  However, defendants submitted the following fact: "Some of Boyce & Bynum's contracts with clients specified that Edge Inc. or Edge LLC was the phlebotomy services provider for the client."  (Defendants' Fact #55)

[8]Defendants state that they admit these allegations, but object to any characterization that Boyce entered into a contract with any client that created obligations or benefitted Edge LLC.

9

80.      Boyce & Bynum employees who were responsible for maintaining client satisfaction were familiar with the Edge LLC phlebotomists, since the phlebotomists were the main contact with their common clients. (Defendants' Fact #35)

81.      Boyce & Bynum had an interest in ensuring that its clients also had a positive impression of Edge LLC, since Boyce & Bynum employees did not have direct contact with the client. (Defendants' Fact #36)

82.      Therien's marketing responsibilities included making sure Boyce & Bynum's clients were satisfied with the services they were receiving. (Defendants' Fact #59)

83.      Since most of the client contact was made by phlebotomists employed by Edge Inc. or Edge LLC, Therien occasionally had to work with Edge regarding procedures and problems with its phlebotomists. (Defendants' Fact #60)

84.      In her role as lab services supervisor, Sheryl Walton met with Therien regularly to discuss issues with nursing homes and to make plans for nursing homes they were going to visit. (Defendants' Fact #61)

85.      Gerry Therien and Sheryl Walton would discuss numerous billing issues at weekly meetings: "we had difficulties with some nursing homes not properly filling out requisitions; therefore, we had difficulty billing." (Plaintiffs' Fact #99; Defendants' Fact #62)

86.      Walton and Therien only discussed clients that they had in common–Walton did not discuss Boyce & Bynum's other clients with Therien. (Defendants' Fact #63)

87.      Therien had similar meetings about client service issues with the former lab services supervisor, Larry Coffman. (Defendants' Fact #64)

88.      Therien sent Walton a memo regarding business development for Boyce & Bynum in March 2003. (Defendants' Fact #73)

89.      Therien is positive that Walton was a Boyce & Bynum employee when he sent the memo to her. (Defendants' Fact #74)

90.      Walton had been employed by Edge LLC until a car wreck in December 2002. (Defendants' Fact #75)

91.      After recovering from her injuries, Walton started working in Kansas City. Walton was working in Kansas City at the time she received the memo from Therien. (Defendants' Fact #76)

92.      Although Walton does not remember who her employer was when she came back to

work after the car accident, she does remember that she was paid by Boyce when she was working in Kansas City and that Lee Dillon had no control over her work. (Defendants' Fact #77)

**C.**    **Accounting**

93.     In the fall of 2002, when Edge LLC came into existence, Michael Gray approached Roger Asbury to perform work for Edge LLC. (Plaintiffs' Fact #20; Defendants' Fact #37)

94.     Michael Gray testified that he, Mike Curry, Bob Cheek and Edge Inc. asked Asbury to do the bookkeeping work as a personal favor. (Defendants' Fact #38 (modified))[9]

95.     Asbury was informed by Michael Gray that his duties and responsibilities for Edge LLC would include doing Edge LLC's accounts payable and review of summary of accounts receivables and prepare monthly financial statements. (Plaintiffs' Fact #21)

96.     Asbury also prepared and filed with the IRS and State, the Form 1065 partnership tax returns for Edge LLC. (Plaintiffs' Fact #22)

97.     Asbury also paid bills and wrote reimbursement checks to Edge LLC employees. (Defendants' Fact #40 (modified))[10]

98.     Asbury paid Edge LLC's bills and reimbursements out of Edge LLC's bank account. (Defendants' Fact #41)

99.     Asbury printed the Edge LLC checks from his Boyce & Bynum office in Columbia and they were signed by Michael Gray, co-owner of Edge LLC. (Defendants's Fact #42)

100.     Asbury sent the reimbursement checks to the Edge LLC office in Springfield, through a courier service that Boyce & Bynum used to send items between the offices Boyce & Bynum maintained in Springfield and Columbia. (Defendants' Fact #43)

101.     In order to produce monthly financial statements for Edge LLC, Asbury gathered information from Lee Dillon, including: "the bank statements and the summary of

---

[9]While plaintiffs deny this fact, the references provided by plaintiffs do not support their challenge to defendants' fact. This fact, however, was modified to more accurately reflect what the citation provided by defendants supports.

[10]Per plaintiffs' objection, this fact was modified.

11

their accounts receivable system for accounts and aged accounts receivable balance and cash postings for the month, charges for the month." (Plaintiffs' Fact #23)

102.  Asbury did not decide which method to use for preparing Edge LLC's financial statements. (Lee Dillon or Michael Gray made that decision.) (Defendants' Fact #47)

103.  Asbury did the equivalent accounting work of accounts payable, accounts receivable and monthly financial statements for defendant Boyce & Bynum. (Plaintiffs' Fact #24)

104.  Asbury performed similar bookkeeping work as a favor to other colleagues at Boyce & Bynum who own companies unrelated to Boyce & Bynum. (Defendants' Fact #39)

105.  Asbury performed his work for Edge LLC at the 200 Portland address, the office of Boyce & Bynum. (Plaintiffs' Fact #25)

106.  The information Asbury received from Edge LLC, including bank statements and financial ledgers, was kept in a file cabinet in Asbury's office at the 200 Portland address of defendant Boyce & Bynum. (Plaintiffs' Fact #26)

107.  These financial documents relating to Edge LLC were kept in the same file cabinet as the equivalent documents relating to defendant Boyce & Bynum. (Plaintiffs' Fact #27)

108.  Asbury used the same phone and fax number while working on the financial information of both Edge LLC and defendant Boyce & Bynum. (Plaintiffs' Fact #28)

109.  Gerry Therien was aware that Asbury was performing duties for Edge LLC. (Plaintiffs' Fact #29)

110.  Asbury performed all the duties related to accounting for Edge LLC as part of Asbury's normal working duties and during Asbury's normal working hours for defendant Boyce & Bynum. (Plaintiffs' Fact #30)[11]

111.  Edge LLC did not pay Asbury any compensation for performing financial services for Edge LLC. (Plaintiffs' Fact #31)

---

[11]Defendants state that they admit these allegations, but object to any characterization that Asbury performed work from Edge LLC as part of his Boyce job duties.

12

112.    Asbury received no W-2, W-4 or 1099 from Edge LLC.  (Plaintiffs' Fact #32)

113.    Edge LLC never paid defendant Boyce & Bynum for the services performed by Asbury.  (Plaintiffs' Fact #33)

114.    Asbury had discussions with Lee Dillon in order to review accounts payable items and gather information to prepare for the monthly financial statement.  (Plaintiffs' Fact #38)

115.    Asbury would use the information provided by Lee Dillon to accrue accounts receivable and revenue and determine discounts.  (Plaintiffs' Fact #34)

116.    Asbury would provide the information to Michael Gray, Lee Dillon, Karen White or Tom Smith once he determined the accrued accounts received, revenue and discounts of Edge LLC.  (Plaintiffs' Fact #35)

117.    Asbury reported to Michael Gray as an employee of defendant Boyce & Bynum. (Plaintiffs' Fact #36)

118.    Asbury reported to Michael Gray in performing his duties performing accounting work for Edge LLC.  (Plaintiffs' Fact #37)

119.    If Dr. Michael Curry had questions about Edge LLC accounting issues, Asbury would discuss Edge LLC accounting with Dr. Curry.  (Plaintiffs' Additional Fact #194)

120.    Asbury did not share any Edge LLC financial information with the Boyce & Bynum Board of Directors as a group.  (Defendants' Fact #48 (modified))[12]

121.    Employees of Edge LLC in Springfield would gather invoices and send them to Asbury in Columbia for payment and to enter into the accounting system. (Plaintiffs' Fact #39)

122.    Asbury wrote the checks for payment of the expenses of Edge LLC.  (Plaintiffs' Fact #40)

123.    Asbury did not determine which Edge LLC bills should be paid or when to pay them. (Defendants' Fact #46)

124.    The checks had the Edge LLC name on them.  (Plaintiffs' Fact #41)

_____

[12]Per plaintiffs' objection, this fact was modified.

125. Asbury ordered the checks of Edge LLC. (Plaintiffs' Fact #42)

126. Asbury ordered a specific type of check to match the accounting software of defendant Boyce & Bynum. (Plaintiffs' Fact #43)

127. The checks for expenses would generally be signed by Michael Gray. (Plaintiffs' Fact #44)

128. Asbury did not have authority to sign checks written on the Edge LLC bank account. (Defendants' Fact #45)

129. Asbury used defendant Boyce & Bynum's equipment to perform accounting services for Edge LLC, including work on the accounts receivable, accounts payable and monthly financial statements of Edge LLC. (Plaintiffs' Fact #45)

130. Asbury would take invoices for goods or services acquired by Edge LLC, make a list of invoices, and then discuss with Lee Dillon, Tom Smith or Karen White which items needed to be paid within the next week or two weeks, assessing and aging the accounts payable to determine which to pay first. (Plaintiffs' Fact #46)

131. Once Asbury confirmed which invoices had priority, he would enter the items "we wanted to pay–they wanted to pay, I would enter those into the accounting system in order to generate the check." (Plaintiffs' Fact #47)[13]

132. Once Asbury entered invoice information into the accounting system, a check would be generated and then taken to Michael Gray for signature. (Plaintiffs' Fact #48)

133. Checks signed by Michael Gray would then be returned to Asbury, who would match those with remittance advices and mail them from the 200 Portland address of defendant Boyce & Bynum, using Boyce & Bynum's postage. (Plaintiffs' Fact #49)

134. Asbury gave Edge LLC input and ideas related to internal controls of the accounts receivables, such as procedures to perform month end reconciliation of deposits and posting records. (Plaintiffs' Fact #50)[14]

135. Asbury performed the financial statements of Edge LLC on a monthly basis, entering the accounts payable into the system, recording credit and cash debits and

---

[13]Defendants state that they admit these allegations, but object to any characterization that Asbury had any decision-making authority over which invoices would be paid.

[14]Defendants state that they admit these allegations, but object to any characterization that Asbury had decision-making authority over internal control of LLC finances.

14

performing bank reconciliation.  (Plaintiffs' Fact #51)

136.    Asbury also performed the year end financial statements of Edge LLC.  (Plaintiffs' Fact #52)

137.    Michael Gray or Lee Dillon communicated to the bank to request that bank statements of Edge LLC be mailed directly to Asbury at the 200 Portland address.  (Plaintiffs' Fact #53)

138.    Asbury received directly from the bank the monthly bank statements of Edge LLC at the 200 Portland address of defendant Boyce & Bynum.  (Plaintiffs' Fact #54)

139.    The bank statements of Edge LLC were from Boone County National Bank, the same bank used by defendant Boyce & Bynum.  (Plaintiffs' Fact #55)

140.    Asbury would receive documentation, process requests and generate checks for the expenses of Edge LLC employees.  (Plaintiffs' Fact #56)[15]

141.    Boyce & Bynum hired and paid for a courier, which was used to deliver the expense checks of Edge LLC employees from Asbury to Edge LLC for distribution to the employees.  (Plaintiffs' Fact #57)[16]  This courier also brought blood and urine specimens from Springfield to Columbia.  (Defendants' Response to Plaintiffs' Fact #57; Roger Asbury Depo. at 27)

142.    Asbury communicated with plaintiff Robin Kalb about the expense reports and checks of the employees of Edge LLC.  (Plaintiffs' Fact #58)

143.    In the beginning, Kalb communicated with Karen White on various expenses of Edge LLC employees, such as mileage.  However, Karen White became so overloaded, she had Kalb deal directly with Asbury to submit requests and obtain payment of expenses.  (Plaintiffs' Fact #59)

144.    Kalb spoke to Asbury about payroll checks paid to employees of Edge LLC when there was a mistake or a correction that needed to be made.  (Plaintiffs' Fact #63)

145.    In her capacity as office manager for Edge LLC, Karen White had discussions with

_____

[15]Defendants state that they admit these allegations, but object to any characterization that Asbury had decision-making authority over which expenses were to be paid.

[16]Defendants state that they admit these allegations, but object to any characterization that Boyce hired the courier for the sole purpose of transporting Edge LLC expense checks.

Michael Gray concerning payroll issues. (Plaintiffs' Fact #111)[17]

146. Karen White collected time cards for Edge LLC employees, tallied the hours and tallied the employees' expenses. (Plaintiffs' Fact #112)

147. Karen White had a sheet that she formulated that had all of the employees' names on it, that she used to record payroll hours and expense information. (Plaintiffs' Fact #113)

148. Karen White was instructed to call Michael Gray or Roger Asbury before faxing payroll information to Michael Gray. (Plaintiffs' Fact #114)[18]

149. Karen White faxed this payroll information to Michael Gray and Roger Asbury at the Boyce & Bynum office at 200 Portland in Columbia, Missouri. (Plaintiffs' Fact #115)[19]

150. After Karen White faxed Edge LLC payroll information to Michael Gray, Gray would review, make any adjustments he determined were necessary and call White to tell her whether the numbers were okay. (Plaintiffs' Fact #116)[20]

151. Once Michael Gray approved the payroll information, White called it in to a St. Louis company that actually did the payroll. (Plaintiffs' Fact #117)

152. Karen White discussed employee expenses with Michael Gray. (Plaintiffs' Fact

---

[17]Defendants state that they admit these allegations, but object to any characterization that Michael Gray discussed Edge LLC payroll issues with Karen White in his capacity as manager of Boyce's business operations.

[18]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury had any decision-making authority over Edge LLC payroll and any characterization that Michael Gray was acting in his capacity as manager of Boyce's operations during this interaction with Karen White.

[19]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury had any decision-making authority over Edge LLC payroll and any characterization that Michael Gray was acting in his capacity as manager of Boyce's operations during this interaction with Karen White.

[20]Defendants state that they admit these allegations, but object to any characterization that Michael Gray was acting in his capacity as manager of Boyce's operations during this interaction with Karen White.

Case 2:05-cv-04001-SWH   Document 54   Filed 07/25/06   Page 16 of 29

#118)[21]

153.    At least some of the expense checks for Edge LLC employees came from Boyce & Bynum's 200 Portland location.  (Plaintiffs' Fact #119)[22]

154.    Karen White discussed employee expenses with Roger Asbury.  (Plaintiffs' Fact #120)[23]

155.    Michael Gray directed Karen White to speak with Roger Asbury about payroll if Michael Gray was not available.  (Plaintiffs' Fact #121)[24]

156.    Roger Asbury sent Karen White faxes regarding Edge LLC's payroll and expenses from Asbury's office in Boyce & Bynum's 200 Portland Location to Edge LLC's Springfield location.  (Plaintiffs' Fact #122)[25]

157.    Karen White shared an office area with Lee Dillon.  (Plaintiffs' Fact #128)

158.    Karen White overheard telephone conversations between Lee Dillon and Michael Gray where Dillon and Gray discussed the business of Edge LLC.  (Plaintiffs' Fact

---

[21]Defendants state that they admit these allegations, but object to any characterization that Michael Gray was acting in his capacity as manager of Boyce's operations during this interaction with Karen White.

[22]Defendants state that they admit these allegations, but object to any characterization that the checks were paid with Boyce funds.

[23]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury was acting in his capacity as a Boyce employee during this interaction with Karen White and any characterization that Asbury had any decision-making authority over which expenses would be paid.

[24]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury was acting in his capacity as a Boyce employee during this interaction with Karen White and any characterization that Asbury had any decision-making authority over Edge LLC payroll.

[25]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury was acting in his capacity as a Boyce employee during this interaction with Karen White and any characterization that Asbury had any decision-making authority over Edge LLC payroll.

#129)[26]

159.	Karen White overheard telephone conversations between Roger Asbury and Lee Dillon where Dillon discussed the operation aspect of payroll and expenses with Asbury. (Plaintiffs' Fact #130)[27]

**D.	<u>Human Resources</u>**

160.	Plaintiffs claim they consulted with Gerry Therien regarding Edge LLC job applications. (Defendants' Fact #65)

161.	When Edge LLC considered applicants for hiring, Robin Kalb communicated with Gerry Therien before making hiring decisions. Kalb would collect information, background checks, driver's license records and safe driving information to make sure applicants had insurance and send that information to Gerry Therien. (Plaintiffs' Fact #62)

162.	Kalb says she sent copies of Edge LLC job applications to Therien for review. (Defendants' Fact #67)

163.	Sheryl Walton traveled with Gerry Therien to meet prospective clients. (Plaintiffs' Fact #90)

164.	Sheryl Walton discussed personnel issues with Gerry Therien. (Plaintiffs' Fact #91)

165.	Sheryl Walton states: "Any time I was going to hire a new phlebotomist I ran those by Gerry." (Plaintiffs' Fact #92)

166.	Usually Sheryl Walton and Gerry Therien "talked about the applicants we had and would decide who we wanted to hire." (Plaintiffs' Fact #93)

167.	Walton says she talked to Therien about Edge LLC job applications to get another opinion from a person in the industry who was knowledgeable about the

---

[26]Defendants state that they admit these allegations, but object to any characterization that Michael Gray was acting in his capacity as a Boyce employee during this interaction with Lee Dillon.

[27]Defendants state that they admit these allegations, but object to any characterization that Roger Asbury was acting in his capacity as a Boyce employee during this interaction with Lee Dillon and any characterization that Asbury had any decision-making authority over which Edge LLC expenses were to be paid or over Edge LLC payroll.

18

qualifications needed for the job.  (Defendants' Fact #66)[28]

168.    Sheryl Walton forwarded applicants that "met with Gerry's approval" to Lee Dillon or Larry Coffman in Springfield.  (Plaintiffs' Fact #94)

169.    If Sheryl Walton was going to hire someone, "they had to have the approval of myself [Sheryl Walton], Gerry Therien and Larry Coffman."  (Plaintiffs' Fact #95)[29]

170.    Any decisions related to Human Resources for Edge LLC would have to be passed through Gerry Therien, who managed Human Resources for Boyce & Bynum.  (Plaintiffs' Fact #96)[30]

171.    Lee Dillon told Karen White to check with Gerry Therien regarding anything to do with Human Resources.  (Plaintiffs' Fact #97)

172.    Both Walton and Kalb state that they communicated with Therien at the request of Lee Dillon.  (Defendants' Fact #68)

173.    Lee Dillon made all final hiring decisions for Edge LLC.  (Defendants' Fact #70)

174.    There was no written policy or practice of Edge Inc. or Edge LLC that required job applications to be approved by Therien or anyone else from Boyce & Bynum.  (Defendants' Fact #71)

175.    Sheryl Walton did not have to interview or fill out an application when her position changed from an employee of Edge LLC to an employee of defendant Boyce & Bynum.  (Plaintiffs' Fact #101)

176.    Robin Kalb reported her allegations of sexual harassment by Lee Dillon to Gerry Therien of Boyce & Bynum.  (Plaintiffs' Fact #71)

177.    Plaintiffs filed a formal complaint of harassment against Edge LLC in May 2003.

_____

[28]Plaintiffs admit the reasons stated were among the reasons why Walton spoke with Therien before making any hires, but object to any characterization that these were the sole or main reasons.

[29]Defendants state that they admit these allegations, but object to any characterization that any written policy of Boyce or Edge required Therien to approve new employees of Edge LLC.

[30]Defendants state that they admit these allegations, but object to any characterization that any written policy of Boyce or Edge required Therien to approve new employees of Edge LLC.

19

(Defendants' Fact #78)

**E.     The Investigation**

178.    In response to the complaint, Edge LLC hired an investigator, Shelley Freeman, to conduct interviews and determine whether the harassment took place. (Defendants' Fact #79)

179.    Freeman conducted her investigation from May to June 2003 and presented a report to the Edge LLC members. (Defendants' Fact #80)

180.    A Confidential Preliminary Investigation Report was prepared by HROI regarding their investigation into the allegations of misconduct by Lee Dillon while Dillon was a member and manager of Edge Medical. (Plaintiffs' Fact #66)

181.    Freeman concluded that Dillon had harassed female employees of Edge LLC. (Defendants' Fact #81)

182.    Based on Freeman's report, Edge LLC fired Dillon in early June 2003. (Defendants' Fact #82)

183.    Michael Gray instructed Asbury to pay the HROI invoice with a Boyce & Bynum check. (Plaintiffs' Fact #68)[31]

184.    Boyce & Bynum paid the invoice for services of HROI in conducting the investigation of the allegations of sexual harassment against Lee Dillon. (Plaintiffs' Fact #69)[32]

185.    The services provided Edge LLC on the contract between Edge LLC and HROI, to investigate the wrongdoings of Lee Dillon, were paid for by defendant Boyce & Bynum. (Plaintiffs' Fact #70)[33]

**F.     Operations After Lee Dillon's Departure**

186.    In late June 2003 (after Dillon had been fired), Edge LLC employees were locked out

---

[31]Defendants state that they admit these allegations, but object to any characterization that Boyce paid for the investigation on Edge LLC's behalf.

[32]Defendants state that they admit these allegations, but object to any characterization that Boyce paid for the investigation on Edge LLC's behalf.

[33]Defendants state that they admit these allegations, but object to any characterization that Boyce paid for the investigation on Edge LLC's behalf.

of Edge LLC's Springfield office when they reported to work. (Defendants' Fact #83)

187. When the Edge LLC employees finally got inside the Springfield office, they discovered that Dillon had broken into the office and stolen most of the documents and equipment in the office. (Defendants' Fact #84)

188. Upon learning that the Edge LLC employees in Springfield could no longer function in their office, Boyce & Bynum allowed certain Edge LLC employees to operate out of Boyce & Bynum's Springfield office. (Defendants' Fact #85)

189. It was in Boyce & Bynum's business interest that Edge LLC continue providing its phlebotomy services to their common clients to ensure that Boyce & Bynum's clients were being properly serviced. (Defendants' Fact #86)

190. Edge LLC never recovered from Dillon's misconduct and theft. (Defendants' Fact #87)

191. Robin Kalb, an employee of Edge LLC, received a paycheck from Edge LLC while assigned to the Boyce & Bynum Primrose office. (Plaintiffs' Fact #64)[34]

192. Gerry Therien made Elizabeth Steel, a Boyce & Bynum employee, supervisor of Kalb at the Primrose address while she was still receiving a check from Edge LLC. (Plaintiffs' Fact #65)[35]

193. After Edge LLC ceased operations, Boyce & Bynum hired some of the Edge LLC employees, including some of the plaintiffs (Hogan, Kalb, Welch and Walton). (Defendants' Fact #88)

194. Boyce & Bynum did not interview plaintiffs before hiring them, since Boyce & Bynum was familiar with their work and Boyce & Bynum wanted to keep the phlebotomy business going to ensure that Boyce & Bynum's clients were being properly serviced. (Defendants' Fact #89)

195. Robin Kalb changed employment from Edge LLC to defendant Boyce & Bynum without an interview or job application. (Plaintiffs' Fact #102)

---

[34]Defendants state that they admit these allegations, but further state that the alleged actions only occurred after Lee Dillon was terminated from Edge LLC.

[35]Defendants state that they admit these allegations, but further state that the alleged actions only occurred after Lee Dillon was terminated from Edge LLC.

196.    Conny Hogan changed employment from Edge LLC to defendant Boyce & Bynum without an interview or job application. (Plaintiffs' Fact #103)

197.    Employees of Boyce & Bynum received and accepted phone calls for Edge LLC at the Primrose office of Boyce & Bynum. (Plaintiffs' Fact #105)[36]

## III.  DISCUSSION

Plaintiffs argue that defendant Boyce & Bynum was a single employer or a joint employer with defendant Edge LLC for purposes of plaintiffs' causes of action in this suit and as single or joint employers, defendants Boyce & Bynum and Edge LLC should be held equally liable to plaintiffs for the sexual discrimination to which plaintiffs were subjected by Lee Dillon. Defendants argue that Boyce & Bynum was not a single or joint employer of plaintiffs with Edge LLC.

The concept of single and joint employers in the Title VII context was examined in Jarred v. Walters Industrial Electronics, Inc., 153 F.Supp.2d 1095 (W.D. Mo. 2001). The court wrote:

> "Title VII of the Civil Rights Act of 1974 is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination." Baker, 560 F.2d at 391[37] (citations omitted). Such a liberal construction is to be given to the definition of "employer," which incorporates the two concepts of "joint employer" and "single employer." See id.; NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117, 1122 (3rd Cir. 1982). A "single employer" relationship exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.' The single entity analysis is appropriate when separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'" Scheidecker v. Arvig Enter., Inc., 122 F.Supp.2d 1031, 1037 (8th Cir. [sic][38] 2000)(citations omitted).

---

[36]Defendants state that they admit these allegations, but further state that the alleged actions only occurred after Lee Dillon was terminated from Edge LLC.

[37]Baker v. Stuart Broad. Co., 560 F.2d 389 (8th Cir. 1977). The Baker case dealt with a claim of sexual discrimination. Id. at 390.

[38]The cite should read "D. Minn."

Case 2:05-cv-04001-SWH   Document 54   Filed 07/25/06   Page 22 of 29

By contrast, the "joint employer" relationship consists of no single integrated enterprise. Rather, the analysis assumes the existence of separate legal entities which have chosen to handle jointly important aspects of their employer-employee relationship. See Scheidecker, 122 F.Supp.2d at 1038 (citations omitted). "A finding of joint employer is proper where one company has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Id.

Jarred, 153 F.Supp.2d at 1098-99.

The analysis to be applied in the Eighth Circuit for determining a single employer or joint employer relationship consists of four factors: (1) the degree of interrelation between the operations of the entities in question; (2) the degree to which those entities shared common management; (3) the degree of centralized control of labor relations as between those entities; and (4) the degree of common ownership or financial control of the entities. See Baker v. Stuart Broad. Co., 560 F.2d 389, 392 (8th Cir. 1977); Jarred v. Walters Indus. Elecs., Inc., 153 F.Supp.2d 1095, 1099 (W.D. Mo. 2001); Equal Employment Opportunity Comm'n v. Financial Assurance, Inc., 624 F. Supp. 686, 689 (W.D. Mo. 1985). All factors must be considered as none alone is controlling. See Baker, 560 F.2d at 392; Financial Assurance, Inc., 624 F. Supp. at 689. However, "stress has normally been laid upon the first three factors." Pulitzer Publ'g Co. v. National Labor Relations Bd., 618 F.2d 1275, 1279 (8th Cir.), cert. denied, 449 U.S. 875 (1980). Consequently, the factor of common ownership is the least relevant in considering whether two business entities may be considered sufficiently integrated to warrant unitary treatment for Title VII purposes. See Jarred, 153 F.Supp.2d at 1100.

In applying this analysis to the instant case, the Court finds as follows:

A.      Interrelationship of Operations

The operations of Boyce & Bynum and Edge LLC are interrelated as evidenced by the following facts:

1.      The Edge LLC letterhead had on it the address of 200 Portland, Columbia, Missouri. (See Fact No. 38, supra) The Operating Agreement of Edge LLC identifies the principal office of Edge LLC as 200 Portland Street, Columbia, Missouri. (See Fact No. 39, supra) Boyce & Bynum's main office is located at 200 Portland, Columbia, Missouri. (See Fact No. 7, supra)

2.      Edge LLC drew blood that was transported to Boyce & Bynum for testing. (See Fact No. 35, supra) Sales people from Boyce & Bynum and Edge LLC often went on sales calls together to solicit a common client for their respective businesses. (See Fact No. 62, supra) Boyce & Bynum and Edge LLC soliciting common clients was advantageous to the clients, because the two companies combined offered a complete service (blood-drawing and testing), rather than the client having to seek out providers of each service separately. (See Fact No. 63, supra) "The whole strategy of this was that we could walk into a home and offer both services, laboratory services and radiology services." (See Fact No. 77, supra) Edge Medical had no clients that were not also Boyce & Bynum clients. (See Fact No. 65, supra)

3.      Gerry Therien, a Boyce & Bynum employee, drafted a contract utilized by Boyce & Bynum with its clients which provided that Boyce & Bynum would perform lab work required by the contract, and that Edge LLC would perform phlebotomy services required by the contract. (See Fact Nos. 54, 69 and 70, supra) The contract offered to clients of Boyce & Bynum set forth the duties of Boyce & Bynum and the duties of Edge Medical. (See Fact No. 72, supra) Edge is the only entity for which defendant Boyce & Bynum had a contract specifying services to be provided to Boyce & Bynum's customers by that entity. (See Fact No. 76, supra)

4.      In her role as lab services supervisor for Edge LLC, Sheryl Walton met with Gerry Therien, a Boyce & Bynum employee, regularly to discuss issues with nursing homes and to make plans for nursing homes they were going to visit. (See Fact Nos. 41, 54 and 84, supra) Gerry Therien and Sheryl Walton would discuss numerous billing issues at weekly meetings: "we had difficulties with some nursing homes not properly filling out requisitions; therefore, we had difficulty billing." (See Fact No. 85, supra)

5.      In the fall of 2002, when Edge LLC came into existence, Michael Gray approached Roger Asbury, a Boyce & Bynum employee, to perform work for Edge LLC. (See Fact Nos. 57 and 93, supra) Michael Gray testified that he, Mike Curry, Bob Cheek and Edge Inc. asked Asbury to do the bookkeeping work as a personal favor. (See Fact No. 94, supra) Asbury was informed by Michael Gray that his duties and responsibilities for Edge LLC would include doing Edge LLC's accounts payable and review of summary of accounts receivables and preparing monthly financial statements. (See Fact No. 95, supra) Asbury prepared and filed with the IRS and State, the Form 1065 partnership tax returns for Edge LLC. (See Fact No. 96, supra) Asbury performed the year end financial statements of Edge LLC. (See Fact No.

24

136, <u>supra</u>)  Asbury also gave Edge LLC input and ideas related to internal controls of the accounts receivables, such as procedures to perform month end reconciliation of deposits and posting records.  (<u>See</u> Fact No. 134, <u>supra</u>)

6.  Roger Asbury, a Boyce & Bynum employee, paid bills and wrote reimbursement checks to Edge LLC employees.  (<u>See</u> Fact Nos. 57 and 97, <u>supra</u>)  Employees of Edge LLC in Springfield would gather invoices and send them to Asbury in Columbia for payment and to enter into the accounting system.  (<u>See</u> Fact No. 121, <u>supra</u>)  Asbury ordered the checks of Edge LLC.  (<u>See</u> Fact No. 125, <u>supra</u>)  Asbury printed the Edge LLC checks from his Boyce & Bynum office in Columbia and they were signed by Michael Gray, co-owner of Edge LLC.  (<u>See</u> Fact No. 99, <u>supra</u>)  Checks signed by Michael Gray would then be returned to Asbury, who would match those with remittance advices and mail them from the 200 Portland address of defendant Boyce & Bynum, using Boyce & Bynum's postage.  (<u>See</u> Fact No. 133, <u>supra</u>)  Asbury sent the reimbursement checks to the Edge LLC office in Springfield through a courier service hired and paid for by Boyce & Bynum which was used to send specimens between the offices Boyce & Bynum maintained in Springfield and Columbia.  (<u>See</u> Fact Nos. 100 and 141, <u>supra</u>)

7.  Asbury performed his work for Edge LLC at the 200 Portland address, the office of Boyce & Bynum.  (<u>See</u> Fact No. 105, <u>supra</u>)  Asbury received directly from the bank the monthly bank statements of Edge LLC at the 200 Portland address of defendant Boyce & Bynum.  (<u>See</u> Fact No. 138, <u>supra</u>)  The financial information Asbury received from Edge LLC was kept in a file cabinet in Asbury's office at the 200 Portland address of defendant Boyce & Bynum.  (<u>See</u> Fact No. 106, <u>supra</u>)  The financial documents relating to Edge LLC were kept in the same file cabinet as the equivalent documents relating to defendant Boyce & Bynum.  (<u>See</u> Fact No. 107, <u>supra</u>)

8.  Asbury used the same phone and fax number while working on the financial information of both Edge LLC and Boyce & Bynum.  (<u>See</u> Fact No. 108, <u>supra</u>)  Asbury used Boyce & Bynum's equipment to perform accounting services for Edge LLC, including work on the accounts receivable, accounts payable and monthly financial statements of Edge LLC.  (<u>See</u> Fact No. 129, <u>supra</u>)  Asbury performed all the duties related to accounting for Edge LLC as part of Asbury's normal working duties and during Asbury's normal working hours for Boyce & Bynum.  (<u>See</u> Fact No. 110, <u>supra</u>)  Edge LLC did not pay Asbury any compensation for performing financial services for Edge LLC.  (<u>See</u> Fact No. 111, <u>supra</u>)  Edge LLC never paid Boyce & Bynum for the services performed by Asbury.  (<u>See</u> Fact No. 113, <u>supra</u>)

9.  Asbury reported to Michael Gray as an employee of Boyce & Bynum.  (<u>See</u> Fact No. 117, <u>supra</u>)  Asbury reported to Michael Gray in performing his duties performing accounting work for Edge LLC.  (<u>See</u> Fact No. 118, <u>supra</u>)  If Dr. Michael Curry had questions about Edge LLC accounting issues, Asbury would discuss Edge LLC

accounting with Dr. Curry.  (See Fact No. 119, supra)

B.     Common Management

Boyce & Bynum and Edge LLC had some management in common as shown by the following facts:

1.     Michael Gray, Dr. Robert Cheek and Dr. Michael Curry are the three top persons on the organizational chart in the hierarchy of defendant Boyce & Bynum.  (See Fact No. 5, supra)  Dr. Curry is President of the Board of Directors of Boyce & Bynum and an officer.  (See Fact No. 44, supra)  Dr. Cheek is Vice President of Boyce & Bynum.  (See Fact No. 53, supra)  Michael Gray is assistant-secretary to the board of directors of Boyce & Bynum.  (See Fact No. 48, supra)

2.     Michael Gray, Dr. Robert Cheek and Dr. Michael Curry were members of Edge LLC along with the corporate entity Edge Inc.  (See Fact No. 30, supra)

3.     Boyce & Bynum's day-to-day operations from 2002 to present were managed by Michael Gray.  (See Fact No. 11, supra)

4.     Lee Dillon was responsible for the day-to-day management of Edge LLC.  Dillon, Gray and Dr. Curry shared "board" decision-making responsibilities.  (See Fact No. 32, supra)  Michael Gray and Dr. Curry were managers of Edge LLC.  (See Fact No. 30, supra)

5.     As president of defendant Boyce & Bynum, Dr. Curry takes part in setting policies and business plans of Boyce & Bynum.  (See Fact No. 45, supra)  Likewise, as a member of the board of managers of Edge LLC, Dr. Curry participated in setting business plans and goals for Edge LLC.  (See Fact No. 46, supra)

6.     Michael Gray was the registered agent for defendant Edge LLC for all dates between October 3, 2002 and December 31, 2003, using the address:  200 Portland Street, Columbia, Missouri 65201.  (See Fact No. 50, supra)

7.     Michael Gray provided answers to plaintiffs' interrogatories on behalf of Edge LLC as a "member and manager."  (See Fact No. 51, supra)  Michael Gray provided answers to plaintiffs' interrogatories on behalf of Boyce & Bynum as a "Vice President."  (See Fact No. 52, supra)

C.     Centralized Control of Labor Relations

Some centralized control of labor relations existed between Boyce & Bynum and Edge LLC

as shown by the following facts:

1. Since most of the client contact was made by phlebotomists employed by Edge Inc. or Edge LLC, Gerry Therien, a Boyce & Bynum employee, occasionally had to work with Edge regarding procedures and problems with its phlebotomists. (<u>See</u> Fact Nos. 54 and 83, <u>supra</u>)

2. When Edge LLC considered applicants for hiring, Robin Kalb communicated with Gerry Therien before making hiring decisions. Kalb would collect information, background checks, driver's license records and safe driving information to make sure applicants had insurance and send that information to Gerry Therien. (<u>See</u> Fact No. 161, <u>supra</u>) Kalb sent copies of Edge LLC job applications to Therien for review. (<u>See</u> Fact No. 162, <u>supra</u>)

3. Sheryl Walton discussed personnel issues with Gerry Therien. (<u>See</u> Fact No. 164, <u>supra</u>) Walton states: "Any time I was going to hire a new phlebotomist I ran those by Gerry." (<u>See</u> Fact No. 165, <u>supra</u>) Usually Walton and Therien "talked about the applicants we had and would decide who we wanted to hire." (<u>See</u> Fact No. 166, <u>supra</u>) Walton forwarded applicants that "met with Gerry's approval" to Lee Dillon or Larry Coffman in Springfield. (<u>See</u> Fact No. 168, <u>supra</u>) If Sheryl Walton was going to hire someone, "they had to have the approval of myself [Sheryl Walton], Gerry Therien and Larry Coffman." (<u>See</u> Fact No. 169, <u>supra</u>)

4. Any decisions related to Human Resources for Edge LLC would have to be passed through Gerry Therien, who managed Human Resources for Boyce & Bynum. (<u>See</u> Fact No. 170, <u>supra</u>)

5. Roger Asbury, a Boyce & Bynum employee, communicated with plaintiff Robin Kalb about the expense reports and checks of the employees of Edge LLC. (<u>See</u> Fact Nos. 57 and 142, <u>supra</u>) Kalb submitted requests to Asbury and obtained payment of expenses from Asbury. (<u>See</u> Fact No. 143, <u>supra</u>) Karen White discussed employee expenses with Roger Asbury. (<u>See</u> Fact No. 154, <u>supra</u>) Robin Kalb spoke to Asbury about payroll checks paid to employees of Edge LLC when there was a mistake or a correction that needed to be made. (<u>See</u> Fact No. 144, <u>supra</u>) Karen White overheard telephone conversations between Roger Asbury and Lee Dillon where Dillon discussed the operation aspect of payroll and expenses with Asbury. (<u>See</u> Fact No. 159, <u>supra</u>)

6. Karen White faxed Edge LLC payroll information to Michael Gray and Roger Asbury at the Boyce & Bynum office at 200 Portland in Columbia, Missouri. (<u>See</u> Fact No. 149, <u>supra</u>) After White faxed this payroll information to Gray, Gray would review the information, make any adjustments he determined were necessary and call White to tell her whether the numbers were okay. (<u>See</u> Fact No. 150, <u>supra</u>) Michael Gray directed Karen White to speak with Roger Asbury about payroll if

Michael Gray was not available. (See Fact No. 155, supra)

7.   Sheryl Walton did not have to interview or fill out an application when her position changed from an employee of Edge LLC to an employee of defendant Boyce & Bynum. (See Fact No. 175, supra)

8.   Robin Kalb reported her allegations of sexual harassment by Lee Dillon to Gerry Therien of Boyce & Bynum. (See Fact No. 176, supra)

9.   The services provided Edge LLC on the contract between Edge LLC and HROI, to investigate the allegations of sexual harassment against Lee Dillon, were paid for by defendant Boyce & Bynum. (See Fact Nos. 184 and 185, supra) Michael Gray instructed Roger Asbury to pay the HROI invoice with a Boyce & Bynum check. (See Fact No. 183, supra)

10.  Upon learning that the Edge LLC employees in Springfield could no longer function in their office, Boyce & Bynum allowed certain Edge LLC employees to operate out of Boyce & Bynum's Springfield office. (See Fact No. 188, supra)

11.  Robin Kalb and Conny Hogan changed employment from Edge LLC to defendant Boyce & Bynum without an interview or job application. (See Fact Nos. 195 and 196, supra)

D.   Common Ownership or Financial Control

There is a limited degree of common ownership or financial control between Boyce & Bynum and Edge LLC as shown by the following facts:

1.   Dr. Robert Cheek and Dr. Michael Curry were two of the eleven shareholders in defendant Boyce & Bynum during the period from October 3, 2002 through December 31, 2003. (See Fact Nos. 9 and 10, supra)

2.   Michael Gray, Dr. Robert Cheek and Dr. Michael Curry were members of Edge LLC along with the corporate entity Edge Inc. (See Fact No. 30, supra)

3.   Dr. Cheek was a "silent owner" of Edge LLC–he had a financial interest in the company but did not participate in the decision-making of the company. (See Fact No. 33, supra)

As noted, all four of the above factors must be considered together, with the factor of common ownership or financial control being the least relevant. When all the evidence is

28

considered, the Court concludes that so many lines have been blurred with respect to the operation and management of the two companies that both Boyce & Bynum and Edge LLC should be considered to be plaintiffs' employers for present purposes.

IV.  CONCLUSION

For the reasons discussed herein, it is

ORDERED that Plaintiffs' Motion for Partial Summary Judgment (doc #44) is granted.  It is further

ORDERED that defendants' Motion for Summary Judgment (doc #45) is denied.


_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE